1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ursula Rosemarie Runnals
9 Middle Road
Lafayette, CA 94549



**F I L E D**

MAR 2 0 2024

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

In re:

Ursula Rosemarie Runnals,

      Debtor.

_____/

Case No. 24-40053
Chapter 13

**DEBTOR'S OBJECTION TO THE**
**FORM 410 PROOF OF CLAIM OF**
**ALLEGED SECURED CREDITOR**
**FILED ON FEBRUARY 6, 2024 BY**
**SEAN CURTIS FERRY SBN 310347;**
**DEBTOR FURTHER OPPOSES THE**
**OBJECTION TO CONFIRMATION OF**
**DEBTOR'S CHAPTER 13 PLAN**
**OF REORGANIZATION FOR CAUSE;**
**JUDICIAL NOTICE OF APPARENT**
**FELONIES**

**INTRODUCTION**

TO THE HONORABLE JUDGE AND ALL PARTIES OF INTEREST:

COMES NOW the Debtor, Ursula Rosemarie Runnals who relies upon ***Haines v.***
***Kerner***, 1972, 404 U.S. 519 in the above-captioned matter, to give notice that Debtor,
hereby serves "**DEBTOR'S OBJECTION TO THE FORM 410 PROOF OF CLAIM OF**
**ALLEGED SECURED CREDITOR FILED ON FEBRUARY 6, 2024, BY SEAN CURTIS**
**FERRY SBN 310347 DEBTOR FURTHER OPPOSES THE OBJECTION TO**
**CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN OF REORGANIZATION**" **FOR**
**CAUSE** which pleadings were filed by Sean Curtis Ferry ("**SCF**") in behalf of  alleged
secured creditor U.S. Bank National Association, as Trustee for Lehman Mortgage Trust

Case: 24-40053   Doc# 27   Filed: 03/20/24   Entered: 03/20/24 12:58:27   Page 1 of 68

Mortgage Pass-Through Certificates, Series 2007-2 ("**USBNA**") and state on the record and for the record the following:

<div align="center">

**OPENING STATEMENT**

</div>

1.       Upon review of **SCF**'s **Form 410 PROOF OF CLAIM** (hereinafter "**POC**") and **OBJECTION TO CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN OF REORGANIZATION** (hereinafter "**OTCODC13POR**") documents that on February 6, 2024, **SCF** did "electronically filed the foregoing with the Clerk of Court" in the above numbered case, wherein the contents of the same on page 3 of the **POC, SCF** purports that **SCF** is the "Authorized Agent for Secured Creditor", **USBNA**.  How is that even possible when a forensic securitization search Debtor has recently filed of record in this instant matter evidence that **USBNA** has no legitimate verifiable Chain of Title claim of right at all when it comes to the subject property of Debtor as a matter of law?

2.       Please be advised that my husband, Donald Runnals hired the service of one Joseph R. Esquivel Jr. to conduct a Mortgage Compliance Investigations Chain of Title Analysis & Mortgage Fraud Investigation request regarding the Loan Instruments and the associated real property located at 9 Middle Road, Lafayette, CA 94549, as referenced in the Contra Costa County Record.  Mr. Esquivel is a licensed private investigator who is known as a fact witness expert regarding issues of securitization of loan documents and mortgage fraud investigations.

3.       Mr. Esquivel was given copies of all Debtor's original loan documents.  Upon conclusion of his research, Mr. Esquivel provided us with his notarized Affidavit of facts pertaining to said loan documents.  The evidence from Mr. Esquivel verified in his research establishes that **USBNA** is **NOT** the creditor/lender/secured party, secured

DEBTOR'S OPPOSES OR **OBJECTION TO THE POC** AND **OTCODC13POR** OF ALLEGED SECURED CREDITOR FILED ON FEBRUARY 6, 2024, BY SEAN CURTIS FERRY         PAGE **2** OF **8**

creditor, etc. having foreclosing rights to Debtor's home. The affidavit reveals that there is no document evidencing any relationship with **USBNA** or any assignor etc. So, how can **USBNA** be empowered to foreclose on Debtor's home or appear in the instant bankruptcy? See copy of Affidavit attached herein as **Exhibit A**.

4. In good faith I wrote in a letter (see copy attached herein as **Exhibit B** and made a part of this objection) to **SCF** addressing the issue that it does appear that **USBNA**'s evidence or statement/s of standing to foreclose contains false, fraudulent and fictitious allegations and therefore **SCF** appears to have made a misrepresentation to the court in violation of **SCF**'s sworn duty as an officer of the court respecting due diligence in preparation of the pleading filed over his signature.

5. The intent of the letter to **SCF** was first, to point out his apparent misrepresentations and then secondly, afford to him an opportunity to make an informed choice to correct and or withdraw those misrepresentations prior to the necessity of having to bring this matter to the attention of the court with appropriate sanctions being requested. Debtor is further prepared to forward a true copy of this notice to the State Bar of California pursuant to B &P C § 6068 (a), (b), (c), (d), (f), (g), §6106, §6128 (a) for purpose of disbarment proceedings against him and his law firm.

6. **This is notice to the court** that in light of the foregoing there does appear to be a fraud on the court by **SCF** characterization of **USBNA** being a "secured creditor" as is stated in his **OTCODC13POR** and the **POC** both electronically filed of record on February 6, 2024 and further sent through the United States Mail service, supporting his statements which fail to establish as fact the actual existence of a "secured creditor" who hired **SCF**'s firm. This is a serious matter involving multiple felonies.

7.    Debtor in good faith suggested to **SCF**, after receiving said letter that if **SCF** would take the proper time to review the original loan documents pertaining to the subject property of interest and the Affidavit of Mr. Esquivel, **SCF** might want to consider withdrawing his pleadings as they currently stand.

8.    Again, in light of the work done by Mr. Esquivel, I contend that either **SCF** or **USBNA** is openly lying before the court (perjury) and cannot meet the standard of "harmless error" as it were and said letter's intent to **SCF** was to bring this matter to his attention prior to the necessity of having to notice the court and other authorities. It was one's hope by mutual agreement that a contest rising from this misrepresentation will become unnecessary.

9.    Debtor maintains that after receipt of said letter to **SCF** and his failure to respond regarding the contents of said letter, Debtor is left to conclude that the sole intent of **SCF's** actions were done for purpose of fraud, deceit, theft of real property rights, unlawful conversion of real property, domestic terrorism, simulation of judicial process for purpose of unjust enrichment, extortion in conjunction with wire fraud, mail fraud in an artifice to deprive Debtor of the intangible right to honest services mandated under Title 18 U.S.C. § 1341, § 1343 and § 1346 among other high crimes and misdemeanors. Clearly, the facts involving the history of this matter, if they had been properly vetted with due diligence by unbiased jurist as required by the rules, would have merely corroborated the facial absence of any legitimate justiciable claim by **USBNA** as a matter of law.

10.    The problem of concern here is that **SCF's** pleadings filed over his signature as attorney of record make allegations which are unsubstantiated and apparently false,

fraudulent and fictitious and thus constitute a material misrepresentation before the court that **SCF** as trained counsel knew or should have known were false as his sworn duty under the mandate of FRCP Rule 11(c), Rule 56(h). Clearly then Penal Code § 115.5, § 115(a), and §134 are apparent felony violations committed by **USBNA,** its assignor/seller by their multiple recordings in the public repository of Contra Costa County Recorder's Office unless **SCF** can rebut the Affidavit of Mr. Joseph R. Esquivel Jr that proves otherwise. The burden of proof shifts to **SCF** to produce dispositive evidence of the specific documents proving FRCP Rule 17 (a) standing to of **USBNA**.

11.     Debtor states for the record and on the record that: **SCF** should be aware, **SCF**'s filing of **OTCOFDC13POR** and **POC** having been filed and their continuation is actionable elder abuse for starters and in due course will result in Debtor having to seek remedies afforded by law. In light of the foregoing fact that neither the court nor Debtor were ever provided actual certified evidence of debt to establish the lawful standing of **USBNA** is a willful violation of FRCP Rule 11(c), B&P Code §6068(d), §6128(a). Simply stated, absent of an actual **verifiable** proof of claim, **USBNA's** appearance is not right pursuant to FRCP 17(a) and Debtor thus demands a complete correction of this wrong. This is horrible and not right. Further the law leaves wrongdoers where it finds them!

12.     Debtor has extended every opportunity for opposing counsel to do the right thing. Sadly, **SCF** has failed, declined, or refused to address said letter or Mr. Esquivel's Affidavit and do the right thing. **SCF** and apparently his firm routinely engages in a scheme of waging warfare upon the rights of the American people in willful contumacy of their sworn oaths of office as attorneys and officers of the court which is treasonous.

## MANDATORY JUDICIAL NOTICE OF APPARENT FELONY

13.     In light of all the foregoing, pursuant to Title 18 U.S.C.§ 4 it is one's duty to bring this matter to the public attention of both the court and bar pursuant to the procedures set out in California law and to further seek and employ all other remedies at law. I do such here and now. "Though the heavens may fall, let justice prevail."

14.     Debtor further request of the court for an order prohibiting **USBNA** and associates from appearing in this instant petition considering **USBNA's** apparent failure to qualify pursuant to the mandate of FRCP Rule 17(a) and Debtor's filing of the Affidavit of Mr. Joseph R. Esquivel Jr. supporting Debtor's opposing and/or objection to **SCF**'s filing of record the **POC** and **OTCODC13POR** in behalf of **USBNA**. Said **USBNA's POC** and **OTCODC13POR** must be stricken from the record of this instant matter in the interest of fundamental justice and due process of law.

### CONCLUSION

15.     Debtor restates that **USBNA** has failed to produce written verifiable proof of status of real party in interest by way of proof of claim establishing as fact a clean <u>CHAIN OF TITLE</u> from the purported original lender to **USBNA**. Debtor respectfully request that **USBNA's POC** be rejected as a matter of law in the interest of fundamental justice. For peonage and involuntary servitude can never be sanctioned by a common law court of competent jurisdiction as a matter of law.

16.     The fact that **USBNA** cannot now, cannot ever produce any evidence that **USBNA** is a real party in interest pursuant to the mandate of FRCP Rule 17(a), **USBNA**'s **POC** and **OTCODC13POR** are without any basis in law that would support said claim of Secured Creditor. As such, said **POC** and **OTCODC13POR** must be

denied, dismissed, etc. in the interest of fundamental justice and clear title to Debtor's homestead be reconveyed to Debtor and the court provide any and further relief the court deems proper in the interest of justice.

WHEREFORE, the Debtor prays that:

1.      the court enter an order denying with prejudice the **POC** and **OTCODC13POR** filed of record by **SCF** due to **USBNA**'s lack of standing as real party in interest;

2.      Pursuant to Title 18 U.S.C. § 4, that sanctions be ordered against **USBNA** and its counsels of record for willful and unethical deprivation of Debtor's property rights, for threats and unreasonable harassments, for circumvention of the inherent right to due process, good faith and fair dealing per the provisions cited in the warning on the Form 410 which cites Title 18 U.S.C. Title 18 U.S.C.§§§ 152, 157, and 3571;

3.      Further, **USBNA** be ordered to remove all their offending documents recorded in the local public repository of the Contra Costa County Recorder's office, that they be ordered to execute a full reconveyance of their purported subject loan against the subject property within three (3) business days from receipt of this order;

4.      in addition, **USBNA** be further ordered to return all moneys in full to **USBNA** that were tendered in good faith by Debtor pertaining to the subject loan with interest at ten per cent annum for seventeen years beginning in 2007.

Dated: March 20, 2024

Respectfully submitted,

Ursula Rosemarie Runnals

Ursula Rosemarie Runnals
9 Middle Road
Lafayette, CA 94549

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

In re:                                          Case No. 24-40053
                                                Chapter 13

Ursula Rosemarie Runnals,

                                                **Declaration of Service**

                    Debtor.
_____/

I, declare as follows:

I am over the age of eighteen years old and not a party to the within action.

On March 20th, A.D. 2024 I served by U.S. Mail a true copy of *DEBTOR'S OBJECTION TO THE FORM 410 PROOF OF CLAIM OF ALLEGED SECURED CREDITOR FILED ON MARCH 6, 2024, BY SEAN CURTIS FERRY SBN 310347; DEBTOR FURTHER OPPOSES THE OBJECTION TO CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN OF REORGANIZATION FOR CAUSE; JUDICIAL NOTICE OF APPARENT FELONIES; AFFIDAVIT OF JOSEPH R. ESQUIVEL JR., Letter to Sean C. Ferry* in the UNITED STATES BANKRUPTCY COURT, NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION to:

Sean C. Ferry                              Martha G. Bronitsky
ROBERTSON, ANSCHUTZ, SCHNEID & CRANE LLP   Office of U.S. Trustee
350 10th Avenue, Suite 1000                P.O. Box 5004
San Diego, CA 92101                        Hayward, CA 94540

And that I served the same by depositing in an envelope a copy of the above stated documents, sealed the same and paid the required postage for mailing which was sent to the addresses herein which has service for U.S. Mail available.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: March 20, 2024                 By: _____

DEBTOR'S OPPOSES OR OBJECTION TO THE POC AND OTCODC13POR OF ALLEGED SECURED CREDITOR FILED ON FEBRUARY 6, 2024, BY SEAN CURTIS FERRY        PAGE 8 OF 8

1
2
3
4

## AFFIDAVIT OF JOSEPH R. ESQUIVEL JR.

5 I, Joseph R. Esquivel Jr, declare as follows:

6   1.  I am over the age of 18 years and qualified to make this Affidavit.

7   2.  I am a licensed private investigator in the State of Texas, License # A20449.

8   3.  I make this Affidavit based on my own personal knowledge.

9   4.  I make this Affidavit in support of Mortgage Compliance Investigations Chain of Title Analysis
10      & Mortgage Fraud Investigation requested by Donald J. Runnals regarding the Loan Instruments
11      and the associated real property located at Address, as referenced in the Contra Costa County
12      Record.

13   5.  I have no direct or indirect interest in the outcome of the case at bar for which I am offering my
14      observations.

15   6.  I have personal knowledge and experience in the topic areas related to the securitization of
16      mortgage loans, real property law, Uniform Commercial Code practices, predatory lending
17      practices, assignment and assumption of securitized loans, creation of trusts under deeds of trust,
18      pooling and servicing agreements, issuance of asset-backed securities and specifically mortgage-
19      backed securities by special purpose vehicles in which an entity is named as trustee for holders
20      of certificates of mortgage backed securities, the foreclosure process of securitized and non-
21      securitized residential mortgages in both judicial and non-judicial states, and the various forms
22      of foreclosure-related fraud.

23   7.  I perform my research through the viewing of loan level data and Corporate/Trust Documents
24      that have been obtained by Housing Mortgage Consultants (William McCaffrey). I then analyze
25      the information for the purpose of the investigation.

26   8.  I have the training, knowledge and experience to perform these searches and understand the
27      meaning of these records and documents with very reliable accuracy.

28

---

1

Affidavit of Joseph R. Esquivel, Jr. for – Donald J. Runnals and Ursula R. Runnals 9 Middle Road, Lafayette, CA
94549

9. I am available for court appearances, in person or via telephone for further clarification or explanation of the information provided herein, or for cross examination if necessary.

10. Mr. McCaffrey of Housing Mortgage Consultants is also available for court appearances, in person or via telephone, for further clarification or explanation of the information provided herein, or for cross examination if necessary.

11. I have been hired by Donald J. Runnals to investigate and review documents pertaining to the property located at 9 Middle Road, Lafayette, CA 94549. These documents have been obtained from the Contra Costa County office of the recorder and from PHH Mortgage Servicing. Those documents are as follows:

| Exhibit | Document Name | Date Recorded | Document Number |
|---|---|---|---|
| A | Note | - Not Recorded - | 124959067 |
| B | Deed of Trust | January 09, 2007 | 2007-0006836-00 |
| C | Corporate Assignment of Deed of Trust | December 20, 2018 | 2018-0203536-00 |
| D | Pages 1-15 of Prospectus Supplement for Lehman Mortgage Trust 2007-2 | -Not Recorded | |

12. On February 14, 2024, the Donald J. Runnals and Ursula R. Runnals payment stream (The Debt) was identified in the Lehman Mortgage Trust 2007-2. This trust is a Special Purpose Vehicle (SPV) which was created for the purpose of issuing mortgage-backed securities.

13. The returns that are paid on the mortgage-backed securities are derived from "slices" ("tranches") of the pool of comingled payments. "Pooling" (commingling) these trust assets to back financial instruments purportedly serve as the foundation for the instruments (as "securities") being offered and sold to secondary-market investors, in the process known as "securitization."

14. The information contained herein was derived by research through professional services, and by reviewing the Loan Level Data obtained from the U.S. Bank Investor Online Portal on February 14, 2024, by independent third-party securitization and banking expert, William McCaffrey (Housing Mortgage Consultants Inc.), who specializes in locating Residential Mortgage-Backed Securities, (RMBS), and VA, FHA and GSE loans. Several identifying loan indicators were researched for the Donald J. Runnals and Ursula R. Runnals Loan (See Exhibits "A" and "B" attached within).

Affidavit of Joseph R. Esquivel, Jr. for – Donald J. Runnals and Ursula R. Runnals 9 Middle Road, Lafayette, CA 94549

15. Based on the research that I have conducted, the evidence shows that the Donald J. Runnals and Ursula R. Runnals payment stream (The Debt) is currently in the Lehman Mortgage Trust 2007-2 as shown by the information below, as of February 14, 2024.

16. The Loan Level Data information for the Donald J. Runnals and Ursula R. Runnals loan below was obtained from the U.S. Bank Investor Online Portal by an independent third party who specializes in locating Residential Mortgage-Backed Securities, (RMBS), and VA, FHA and GSE loans (Housing Mortgage Consultants), William McCaffrey on February 14, 2024.

**Search Results:** – Lehman Mortgage Trust 2007-2

**Trust Closing date:** February 28, 2007
This is the last date in which assets may be placed into the trust.

| loan_id | pool_id | loan_closing_date | deal_closing_date | credit_score | documentation_type |
|---|---|---|---|---|---|
| 123837015 | LMT 2007-2 | 12/22/2006 | 2/28/2007 | 680 | Stated |
| | | **Matches Note** | | | |

| occupancy_type | original_interest_rate | original_loan_bal | original_securitized_bal |
|---|---|---|---|
| Owner Occupied | 6.875 | 780000 | 780000 |
| | **Matches Note** | **Matches Note** | |

| original_amoritization_term | ltv_rat | dti_rate | pp_flag | prepayment_penalty_term | product_type |
|---|---|---|---|---|---|
| 360 | 76.1 | 37.43 | Y | 36 | |
| **Matches Note** | | | | | |

| property_state | property_type | loan_purpose_type | risk_grade_score | lien_position_type | cltv_rate |
|---|---|---|---|---|---|
| CA | Single Family | Cash-out (Equity) refinance | | 1St | 76.1 |
| **Matches Note** | | | | | |

| cutoff_date | loanage_count | mss_count | interest_rate | beg_prin_bal | loan_status | delq_bucket |
|---|---|---|---|---|---|---|
| 12/31/2023 | 205 | 203 | 3.855 | 847804.96 | FC | 90 |

| prepayment_amount | liquidation_bal | current_gain_loss_amount | end_prin_bal | sched_prin |
|---|---|---|---|---|
| 0 | 0 | 0 | 846782.87 | 1022.09 |

| originator | servicer | intcalctype | ratetype | ioterm | margin | origterm | rterm | zfraperiod | mthroll |
|---|---|---|---|---|---|---|---|---|---|
| INDYMAC BANK | NationStar | Interest Only | FIX | 100 | 0 | 362 | 158 | | |
| **Matches Note** | | | | | | | | | |

3

Affidavit of Joseph R. Esquivel, Jr. for – Donald J. Runnals and Ursula R. Runnals 9 Middle Road, Lafayette, CA 94549

| initratecp | perratecp | perpaycp | liferatecp | ratemax | ratemin | ngmType | ngmAmt | ratefreq | payfreq |
|---|---|---|---|---|---|---|---|---|---|
| | 0 | | 0 | | | | | | |

| dnextrate | currltv | PropZip | | pmitype | Silent2nd | simultaneous2nd | blntype | group | pldgtype |
|---|---|---|---|---|---|---|---|---|---|
| | | 94549 | | 00-None | | | Y | 1 | |

**Matches Note**

| pldgamt | eltv | svcrate | otherrate | heloc | modtype | cnvtype | PI | Next_Due | Payoff Date | Act_Bal |
|---|---|---|---|---|---|---|---|---|---|---|
| | 0.25 | 0 | | Y | | | 3745.66 | 1/1/2023 | | 859817.68 |

| Draw | DrawPrd | CreditLimit | Curtailments | PPPenalties | NetInterest | NonRecAdvances | REOBook |
|---|---|---|---|---|---|---|---|
| 0 | | | 0 | 0 | 2546.95 | 0 | 0 |

| REOBookDt | REODt | RAIS | ModDistDt | ModFstPmtDt | ModBalance | ModRate | ModPandl | ModMaturity |
|---|---|---|---|---|---|---|---|---|
| | | 0 | 11/1/2017 | 10/1/2017 | 915884.91 | 3.855 | 3745.66 | 3/1/2037 |

| ModNxtIntAdjDt | ModLoanType | ModBalloonPmt | ModBalloonD | ModCapitalizedAmt | ModForgivenPrin |
|---|---|---|---|---|---|
| | FIX | 0 | 3/1/2037 | 170220.38 | 0 |

| ModDeferredPrin | ModDeferredInt | ModHAMPMod | ModHAMPModRateCap | ModHAMPPartEndDt |
|---|---|---|---|---|
| 0 | 0 | N | | |

| ModHAMPTerminationDt | ModHAMPBonusEligibility | ModHAMPBorrowerSucessPmt |
|---|---|---|
| | | |

| ModHAMPBonusIncentiveAmt | ModHAMPCostShare | ModHAMPAdminFees |
|---|---|---|
| | | |

| ModHAMPHomePriceDeprPmt | StepDueDt2nd | StepRate2nd | StepPI2nd | StepDueDt3rd | StepRate3rd |
|---|---|---|---|---|---|
| | | | | | |

| StepPI3rd | StepDueDt4th | StepRate4th | StepPI4th | StepDueDt5th | StepRate5th | StepPI5th | StepDueDt6th |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| StepRate6th | StepPI6th | Loan_ID2 | ModForgivenInt | PRA_Incentive | HAFA_Incentive | PRA_Amount |
|---|---|---|---|---|---|---|
| | | | 0 | | | |

4

Affidavit of Joseph R. Esquivel, Jr. for – Donald J. Runnals and Ursula R. Runnals 9 Middle Road, Lafayette, CA 94549

```
ModHAMPBorrowerSucessPmtCurrent   ModHAMPBonusIncentiveAmtCurrent
```

```
ModHAMPCostShareCurrent  ModHAMPAdminFeesCurrent  ModHAMPHomePriceDeprPmtCurrent
```

```
PRA_IncentiveCurrent  HAFA_IncentiveCurrent
```

17. Per the Prospectus Supplement (To Prospectus dated January 25, 2006) for the Lehman Mortgage Trust 2007-2 Trust, the transaction participants of the Lehman Mortgage Trust 2007-2 are: (1) **Sponsor/Seller**, Lehman Brothers Holdings Inc., (2) The **Depositor**: Structured Asset Securities Corporation (3) Issuing Entity: Lehman Mortgage Trust 2007-2, a common-law trust created under the laws of the State of New York, pursuant to the Pooling and Servicing Agreement. (4) **Trustee**: The Bank of New York, a banking corporation organized under the laws of the State of New York. The Trust closed on or about February 28, 2007 (see, PROSPECTUS at the SECURITY EXCHANGE COMMISSION'S ("SEC") website https://www.sec.gov/Archives/edgar/data/808851/000114420407010791/v067219_424b5.htm

See also, annexed Exhibit "D," Pages 1-5 of the Lehman Mortgage Trust 2007-2 Prospectus for the convenience of the reader).

18. "Loan Level Data" refers to specific loan characteristics of the loan. Examples of different types of specific data types would be "Loan number," "Original Balance," "Maturity Date," "Property State," "Property Zip Code," "Property City," "Pool Number," and many more. Depending on the information that was available when the information was inputted and entered into the data platform, some loans would have more data available and others would have less.

19. Securitization is the process of "aggregating" (i.e., commingling) the payments from a large number of mortgage loans into what is called a "mortgage pool" and then selling "shares" (called "certificates") to investors, who then receive "returns" over a specific time period. The "pool" of commingled mortgage payments is "sliced" into "tranches" from which many different

Affidavit of Joseph R. Esquivel, Jr. for – Donald J. Runnals and Ursula R. Runnals 9 Middle Road, Lafayette, CA 94549

1  "classes" of investments (with varying rates of "returns") are created, and subsequently offered
2  for sale by way of a "prospectus." Based on this information, Donald J. Runnals and Ursula R.
3  Runnals's mortgage payments ultimately flowed to and/or through the "pool" created by or on
4  behalf of the Lehman Mortgage Trust 2007-2 Trust. However, in my opinion, it is impossible to
5  determine the exact amounts from any mortgage payment paid out to any specific investor, as
6  this was done *after* Donald J. Runnals and Ursula R. Runnals's payments were commingled with
   other monies.

7  20. The indicators pertaining to the Donald J. Runnals and Ursula R. Runnals loan show that the
8      payment stream (The Debt) was securitized, however it was not done properly; and that Lehman
9      Mortgage Trust 2007-2 paid value for the  Donald J. Runnals and Ursula R. Runnals payment
10     stream (The Debt)  which was the right to collect future payments for the Donald J. Runnals and
11     Ursula R. Runnals mortgage loan.

12 21. Residential mortgage-backed securities, or RMBS, are bonds or notes created by securitization
13     that are backed by residential mortgages or residential real estate loans. RMBS originators are
14     typically financial institutions that originate residential real estate or residential mortgage loans,
15     including banks, building societies/savings & loans and mortgage finance companies. However,
16     issuers could also include government-guaranteed securities issued following bank bailouts, such
17     as TARP or TALF, and the Government Sponsored Enterprises Fannie Mae and Freddie Mac.

18 22. To create residential mortgage-backed securities, or RMBS, institutions sell pools of their loans
19     to a special-purpose vehicle, or SPV, which then sells the loans to a trust. The trust then
20     repackages the loans as interest-bearing securities and issues them. This true sale of the loans to
21     the SPV ensures that the RMBS is treated as bankruptcy-remote from the originator.

22 23. These trust entities are REMIC'S in which the IRS describes a (Real Estate Mortgage Investment
23     Conduit) REMIC as an entity formed for the purpose of holding a fixed pool of mortgages secured
24     by interests in real property (IRS Publication 550, Investment Income and Expenses, 2015)

25 24. In order for these entities to work properly, they must be bankruptcy remote. Which means that
26     there must be a minimum of (2) two arm's lengths transactions prior to going into the trust. This
27     is why there is a Sponsor/Seller, Depositor and a Trustee named as separate entities to the Trust.

28

6

Affidavit of Joseph R. Esquivel, Jr. for – Donald J. Runnals and Ursula R. Runnals 9 Middle Road, Lafayette, CA
94549

25. Without these transactions going through the proper parties, valid transactions can not take place and that would leave the trust without having properly secured assets for the certificate holders.

26. Below is a list of the transactions which should have taken place, however there is no evidence of these transactions taking place on the Note. This information is taken from the Lehman Mortgage Trust 2007-2.

27. Per the Prospectus Supplement (To Prospectus dated January 25, 2006) for the Lehman Mortgage Trust 2007-2 Trust, the transaction participants of the Lehman Mortgage Trust 2007-2 are: (1) **Sponsor/Seller**, Lehman Brothers Holdings Inc., (2) The **Depositor**: Structured Asset Securities Corporation (3) Issuing Entity: Lehman Mortgage Trust 2007-2, a common-law trust created under the laws of the State of New York, pursuant to the Pooling and Servicing Agreement. (4) **Trustee**: The Bank of New York, a banking corporation organized under the laws of the State of New York. The Trust closed on or about February 28, 2007 (see, PROSPECTUS at the SECURITY EXCHANGE COMMISSION'S ("SEC") website
https://www.sec.gov/Archives/edgar/data/808851/000114420407010791/v067219_424b5.htm

    See also, annexed Exhibit "D," Pages 1-5 of the Lehman Mortgage Trust 2007-2 Prospectus for the convenience of the reader).

28. I have examined a purported to be true and correct copy of a Note dated December 22, 2006, relating to that Security Instrument dated December 22, 2006, obtained by the borrower from PHH Mortgage on or about June 23, 2023

    a.  This copy of the Donald J. Runnals and Ursula R. Runnals Note has an incomplete stamping on the Note itself from IndyMac Bank, F.S.B., signed by Jan Hammond as Vice President, made payable to to an as of yet unnamed payee.

29. The Lehman Mortgage Trust 2007-2 are not named in any way on the Donald J. Runnals and Ursula R. Runnals Note.

    a.  Lehman Brothers Holdings Inc., as Seller for the Lehman Mortgage Trust 2007-2 not in its Individual Capacity but solely as Trustee for Lehman Mortgage Trust 2007-2 is not named or referenced in any way on the Donald J. Runnals and Ursula R. Runnals Note.

b. The Structured Asset Securities Corporation Depositor for the Lehman Mortgage Trust 2007-2 is not named or referenced in any way on the Donald J. Runnals and Ursula R. Runnals Note.

c. U.S. Bank National Association as Trustee for the Lehman Mortgage Trust 2007-2 not in its Individual Capacity but solely as Trustee for Lehman Mortgage Trust 2007-2 is not named anywhere within the Donald J. Runnals and Ursula R. Runnals Note.

30. There is no evidence that Lehman Mortgage Trust 2007-2 ever received an ownership interest in the Donald J. Runnals and Ursula R. Runnals Note.

31. Endorsement is mechanically necessary to constitute transfer interest to party not originally named. Entitlement to enforce a note focuses on the relationship between the maker of the note and the person enforcing it. Ownership of the note is a concept that deals with who is entitled to the economic fruits of the note.

32. Paragraph 1 of the Donald J. Runnals and Ursula R. Runnals Note states "*I understand that the Lender may transfer this Note. The Lender or Anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Noteholder*."

33. I have examined a Deed of Trust of Donald J. Runnals and Ursula R. Runnals dated December 22, 2006, and filed in the Official Records of the Contra Costa Recorder's Office on January 09, 2007, as ins# 2007-0006836-00 (See Exhibit "B" attached within).

d. The **Lehman Mortgage Trust 2007-2** are not named in any way to the Donald J. Runnals and Ursula R. Runnals Deed of Trust

e. Lehman Brothers Holdings Inc., as Seller for the Lehman Mortgage Trust 2007-2 not in its Individual Capacity but solely as Trustee for Lehman Mortgage Trust 2007-2 is not named or referenced in any way on the Donald J. Runnals and Ursula R. Runnals Deed of Trust

f. The Structured Asset Securities Corporation Depositor for the Lehman Mortgage Trust 2007-2 is not named or referenced in any way on the Donald J. Runnals and Ursula R. Runnals Deed of Trust.

//

8

Case: 24-40053   Doc# 27   Filed: 03/20/24   Entered: 03/20/24 12:58:27   Page 16 of 68

34. I have examined the Contra Costa County Record relating to the Donald J. Runnals and Ursula R. Runnals Deed of Trust dated December 22, 2006. The Contra Costa County Record shows an "Corporate Assignment of Deed of Trust", dated December 14, 2018 and filed in the Official Records of the Contra Costa Recorder's Office on December 20, 2018 as ins# 2018-0203536-00, signed by Jimilla B. Hicks as Assistant Secretary for Mortgage Electronic Registration Systems, Inc., and notarized December 14, 2018 by Kayla Murphy, Florida Notary Commission #FF 242558, where Mortgage Electronic Registration Systems, Inc., grants, assigns, and transfers to U.S. Bank National Association, as Trustee for Lehman Mortgage Trust Mortgage pass-Through Certificates, Series 2007-2 all its interest under that certain Deed of Trust....

35. The Donald J. Runnals and Ursula R. Runnals Assignment of Deed of Trust was recorded on August 19, 2011, which is eleven (11) years **after** the Trust closed on or about February 28, 2007, with, allegedly, Donald J. Runnals and Ursula R. Runnals's Note and Deed of Trust already in the Trust.

36. There is no sale of the Donald J. Runnals and Ursula R. Runnals Mortgage Loan caused through the Donald J. Runnals and Ursula R. Runnals Assignment of Deed of Trust.

37. I have examined a copy of the MERS Procedures Manual, Release 19.0, dated June 14, 2010, and MERS Residential Marketing Kit, Terms And Conditions: (see Exhibit "D" attached within)

    g.  It is stated in the MERS Procedures Manual, Release 19.0, dated June 14, 2010:

        Page 63 – Transfer of Beneficial Rights to Member Investors, Overview:

        **"Although MERS tracks changes in ownership of the beneficial rights for loans registered on the MERS System, MERS cannot transfer the beneficial rights to the debt. The debt can only be transferred by properly endorsing the promissory note to the transferee."** (emphasis added)

        It is stated in the MERS Residential Marketing Kit, Terms And Conditions:

        2. ...MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. **MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights** (other than rights specified in the Governing Documents) with respect to such mortgage loans or

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 17 of 68

mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law. (emphasis added)

6. **MERS and the Member agree that: (i) the MERS System is not a vehicle for creating or transferring beneficial interests in mortgage loans**… (emphasis added)

38. It is my professional observation, there was no "true sale" of the Donald J. Runnals and Ursula R. Runnals Mortgage Loan caused through the Donald J. Runnals and Ursula R. Runnals recorded Corporate Assignment of Deed of Trust.

39. Based on my examination of the Donald J. Runnals and Ursula R. Runnals loan instruments, and all available documents recorded in the Contra Costa County records associated therewith, there is no evidence or indication that Lehman Mortgage Trust 2007-2 ever acquired ownership rights to the Donald J. Runnals and Ursula R. Runnals loan, note, Deed of Trust, the debt purportedly 'evidenced' thereby, and/or the real property purportedly 'secured' thereby.

40. Based on my examination, as Lehman Mortgage Trust 2007-2 has never acquired rights to the Donald J. Runnals and Ursula R. Runnals Note and Deed of Trust, those rights can not be transferred to another party. Historically an Assignment of the Deed of Trust without an assignment of the debt creates no right in the assignee.

41. In my professional observation, all the available evidence that I have examined lacks proof, or even a showing, of any proper transfer of the debt obligation (purportedly evidenced by the note) along with proper transfer of collateral rights in the real property (purportedly evidenced by the Deed of Trust). In fact, there is no evidence that suggests the Donald J. Runnals and Ursula R. Runnals note was properly transferred simultaneously with any purported transfer of the beneficial rights in the Donald J. Runnals and Ursula R. Runnals Deed of Trust.

42. The transfer and sale of all Beneficial Interest of the Donald J. Runnals and Ursula R. Runnals Deed of Trust to Lehman Mortgage Trust 2007-2 should have been done on or before the Closing Date of the Lehman Mortgage Trust 2007-2 which was February 28, 2007.

//

Affidavit of Joseph R. Esquivel, Jr. for – Donald J. Runnals and Ursula R. Runnals 9 Middle Road, Lafayette, CA 94549

The above statements are affirmed by me under penalty of perjury under the laws of the State of Texas to be true and correct to the best of my knowledge and belief, are based on my own personal knowledge, and I am competent to make these statements.

FURTHER THE AFFIANT SAYETH NAUGHT

By; *(signature)*

Joseph R Esquivel, Jr.
Private Investigator License # A20449
Mortgage Compliance Investigations LLC

STATE OF TEXAS        )
                      )
COUNTY OF TRAVIS      )

Subscribed and sworn before me, _Lori M. Esquivel_, Notary Public, on this _22nd_ day of _February_, 2024 by Joseph R Esquivel, Jr proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS my hand and official seal.

*(notary seal: LORI M. ESQUIVEL / ID #130167889 / My Commission Expires / March 25, 2027 / NOTARY PUBLIC STATE OF TEXAS)*

_Lori M. Esquie_
Notary Public

11

Affidavit of Joseph R. Esquivel, Jr. for – Donald J. Runnals and Ursula R. Runnals 9 Middle Road, Lafayette, CA 94549

# EXHIBIT "A"



# INTEREST ONLY FIXED RATE NOTE

Loan # 124959067

December 22, 2006

[Date]                                    [City]                                    [State]

9 Middle Road, Lafayette, CA 94549

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 780,000.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **IndyMac Bank, F.S.B., a federally chartered savings bank**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of       6.875   %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month on the first day of the month beginning on **February 1, 2007**    . Before the first fully amortizing principal and interest payment due date, my monthly payments will be only for the interest due on the unpaid principal of this Note. The due date of my first payment including fully amortizing principal and interest is the first day of    **February 1, 2017**    . I will make payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on    **January 1, 2037** , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at IndyMac Bank, F.S.B.  P.O. Box 78826, Phoenix, AZ 85062-8826                                    or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 4,468.75           until the due date of the first fully amortizing principal and interest payment. Beginning with the first fully amortizing principal and interest payment, my payment will be in the amount of U.S. $  5,988.95    .

The Note Holder will notify me prior to the date of any change in the amount of my monthly payment in accordance with Section 7 of this Note. The Note Holder will provide the title and telephone number of a person who will answer any questions I may have regarding the notice.

MIN: 10005540124959067 2

IndyMac Bank
Interest Only Fixed Rate Note - Multistate

Page 1 of 4

8480783 (0406)

VMP Mortgage Solutions, Inc (800)521-7291

Form 1000
4/06

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 21 of 68

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to the changes. If I make a partial Prepayment during the period ending with the due date of my last interest only monthly payment, the partial Prepayment will reduce the amount of my monthly payment. If I make a partial Prepayment after the due date of my last interest only payment, the amount of my monthly payment will not change unless the Note Holder agrees in writing to that change.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

    **(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of   15   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.00   % of the overdue payment of interest during the period when my payment is interest only, and of principal and interest after that. I will pay this late charge promptly but only once on each late payment.

    **(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

    **(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

    **(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

    **(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 23 of 68

Pay To The Order Of

Without Recourse
IndyMac Bank, F.S.B.
By:

Jan Hammond
Vice President

Loan No: 124959067

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Donald J Runnals                  -Borrower

_____ (Seal)
Ursula R Runnals                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

_____ (Seal)
                                  -Borrower

*[Sign Original Only]*

*...and Title Ins. Co.*
*...Copy*

## ADDENDUM TO FIXED RATE/BALLOON NOTE
### (Prepayment)

THIS ADDENDUM is made this 22nd day of December, 2006, and is incorporated into and intended to form a part of the Note dated the same date as this Addendum.

1.  Section 4 of the Note is modified to provide that I have the right to make payments of principal at any time before they are due. A Prepayment of the entire unpaid principal balance is known as a "Full Prepayment." A Prepayment of only part of the unpaid principal balance is known as a "Partial Prepayment."

Except as provided below, I may make a Full Prepayment or a Partial Prepayment at any time without paying any Prepayment charge. If within the first three ( 3 ) year(s) I make a Partial Prepayment or Partial Prepayment(s) twenty percent (20%) of the original principal amount in any twelve (12) month period, I will not pay a Prepayment penalty. However, if within the first three ( 3 ) year(s), I make a Full Prepayment, Partial Prepayment or Partial Prepayments of more than twenty percent (20%) of the original principal amount in any 12-month period, I will pay a Prepayment charge in an amount equal to the payment of six (6) months' advance interest on the amount prepaid in excess of twenty percent (20%) of the original principal amount.

If I make a Partial Prepayment equal to one or more of my monthly payments, the due date of my next scheduled monthly payment may be advanced no more than one month. If I make a Partial Prepayment in any other amount, I must still make all subsequent monthly payments as scheduled.

2.  All other provisions of the Note are unchanged by this Addendum and remain in full force and effect.

Dated: 2 JAN 07

_____ (Seal)
Donald J Runnals          -Borrower

_____ (Seal)
Ursula R Runnals          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

IndyMac Bank and Federally Exempted Seller Use Only
Hard Prepayment Addendum (1-3 yrs) - Fixed Rate/Balloon
First Mortgages - Multistate, Arkansas (loans over $150,000)

8480278 (0407)          VMP Mortgage Solutions, Inc. (800)521-7291

SPD #083
(08/04)

# EXHIBIT "B"

Commonwealth

**Recording Requested By:**

IndyMac Bank, F.S.B. c/o Document Mana

*[Company Name]*

**And When Recorded Mail To:**

IndyMac Bank, F.S.B. c/o Document Mana

*[Company Name]*

*[Name of Natural Person]*
901 E. 104th Street Building B Suite 4(

*[Street Address]*

Kansas City, MO 64131

*[City, State Zip Code]*

CONTRA COSTA Co Recorder Office
STEPHEN L. WEIR, Clerk-Recorder
DOC- 2007-0006836-00
Acct 3- Commonwealth Title
Tuesday, JAN 09, 2007 08:00:00
MIC    $1.00 MOD   $14.00 REC   $18.00
FTC   $13.00 DAF    $1.80 REF    $0.20
Ttl Pd    $48.00          Nbr-0003553608
                          dar/R2/1-14

26430853       *[Space Above This Line For Recording Data]*

# DEED OF TRUST

MIN: 100055401249590672

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "**Security Instrument**" means this document, which is dated December 22, 2006 , together with all Riders to this document.

**(B)** "**Borrower**" is Donald J Runnals and Ursula R Runnals married as joint tenants

. Borrower is the trustor under this Security Instrument.

**(C)** "**Lender**" is IndyMac Bank, F.S.B., a federally chartered savings bank

Lender is a Federal Savings Bank organized and existing under the laws of United States of America . Lender's address is 155 North Lake Avenue, Pasadena, CA 91101

**(D)** "**Trustee**" is Commonwealth Land Title Insurance Company

**(E)** "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

Loan No: 124959067

California Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 1 of 13

MERS Modified Form 3005 01/01
14301CA 008/00
© 2000, The Compliance Source, Inc.

(F) **"Note"** means the promissory note signed by Borrower and dated December 22, 2006 . The Note states that Borrower owes Lender seven hundred eighty thousand and NO/100ths Dollars (U.S. $ 780,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than January 1, 2037 .

(G) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower *[check box as applicable]*:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider
☐ Balloon Rider ☐ Planned Unit Development Rider ☐ Biweekly Payment Rider
☐ 1-4 Family Rider ☐ Revocable Trust Rider
☐ Other(s) *[specify]*

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

© 2000, The Compliance Source, Inc.

Case: 24-40053 Doc# 27 Filed: 03/20/24 Entered: 03/20/24 12:58:27 Page 29 of 68

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the     County     of   Contra Costa   :

*[Type of Recording Jurisdiction]*     *[Name of Recording Jurisdiction]*

See Exhibit A attached hereto and made a part hereof

Assessor's Identification Number:   251062006

which currently has the address of       9 Middle Road

*[Street]*

Lafayette     , California     94549     ("Property Address"):

*[City]*       *[Zip Code]*

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any

Loan No: 124959067

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 30 of 68

payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2.   Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3.   Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

    The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

Loan No: 124959067

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 31 of 68

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds,

Loan No: 124959067

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 32 of 68

whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period; Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.    **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.    **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.    **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.    **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or

Loan No: 124959067

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 33 of 68

obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)** Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

**(b)** Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such

Loan No: 124959067

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 34 of 68

Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 35 of 68

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this

Loan No: 124959067

Case: 24-40053   Doc# 27   Filed: 03/20/24   Entered: 03/20/24 12:58:27   Page 36 of 68

Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period, which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

Loan No: 124959067


**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option, may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

Loan No: 124959067

California Deed of Trust-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 11 of 13

MERS Modified Form 3005 01/01
14301CA 08/00
© 2000, The Compliance Source, Inc.



Case: 24-40053   Doc# 27   Filed: 03/20/24   Entered: 03/20/24 12:58:27   Page 38 of 68

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
Donald J Runnals                              -Borrower
                                            [Printed Name]

_____ (Seal)
Ursula R Runnals                             -Borrower
                                            [Printed Name]

_____ (Seal)
                                            -Borrower
                                            [Printed Name]

_____ (Seal)
                                            -Borrower
                                            [Printed Name]

_____ [Acknowledgment on Following Page] _____



Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 39 of 68

State of __CALIFORNIA__                  §
County of __CONTRA COSTA__               §
                                         §

006836

On __January 2, 2008__, before me, __STEVE STOSEN, NOTARY PUBLIC__
*[name and title of officer]*

personally appeared     Donald J Runnals and Ursula R Runnals

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument in person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.
WITNESS my hand and official seal.

Signature _____ (Seal)

STEVE STOSEN
COMM. #1655559
NOTARY PUBLIC - CALIFORNIA
SOLANO COUNTY
COMM. EXPIRES MARCH 30, 2010
MGC1

## REQUEST FOR FULL RECONVEYANCE

TO TRUSTEE:

The undersigned is the holder of the note or notes secured by this Deed of Trust, which was recorded in the office of
the Recorder of _____ County, State of California, in book _____, page _____ of official records.
Said note or notes, together with all other indebtedness secured by this Deed of Trust, have been paid in full. You are hereby
directed to cancel said note or notes and this Deed of Trust, which are delivered hereby, and to reconvey, without warranty,
all the estate now held by you under this Deed of Trust to the person or persons legally entitled thereto.

_____          Date:_____
          (Trustee)

Loan No: 124959067



Case: 24-40053   Doc# 27   Filed: 03/20/24   Entered: 03/20/24 12:58:27   Page 40 of
68

# Exhibit "A"

All that certain real property situated in the County of Contra Costa, State of California, described as follows:

City of Lafayette

Parcel One

Lot 55, as designated on the Map entitled "Hidden Valley Estates Unit No. 2, Rancho Acalanes, Contra Costa County, California" which Map was filed in the office of the Recorder of the County of Contra Costa, State of California, on March 12, 1940, in Volume 24 of Maps at Page 750.

Parcel Two

The right of way granted in the Deed from Robert Rolley, et al, to Hugh J Krampe, et ux, dated August 13, 1948, and recorded September 21, 1948 in Volume 1296 of Official Records, at Page 201, as follows

A Right of way (not to be exclusive) as an appurtenance to Lot 55, as designated on the Map entitled "Hidden Valley Estates, Unit No. 2, Rancho Acalanes, Contra Costa County, California', which Map was filed in the office of the Recorder of the County of Contra Costa State of California, on March 12, 1940, in Volume 24 of Maps at Page 750 for use as a roadway for vehicles of all kinds, pedestrians and animals, for water, gas, oil and sewer pipe lines and for telephone, electric light and power lines, together with the necessary poles or conduits to carry said lines over a portion of Lot 54, as designated on said Map, being a strip of land described as follows:

Beginning on the South line of Middle Road, distant thereon Westerly along the arc of a curve to the right with a radius of 650 feet 22 09 feet from the east line of said Lot 54, thence from said point of beginning Westerly continuing along said from South line, being along the arc of said curve to the right 56 35 feet to a point from which the center of said curve bears North 11° 17' East, thence South 60° 24' 54" East 84 53 feet to the east line of said Lot 54, thence North 7° 36" 10' east along said east line 21 56 feet to a point which bears South 60° 24' 50" east from the point of beginning, thence North 60° 24' 50" West, 23 79 feet to the point of beginning .

Assessor's Parcel Number          **251-062-006**

End of Document

# EXHIBIT "C"

2018902035360002
CONTRA COSTA Co Recorder Office
JOSEPH CANCIAMILLA, Clerk-Recorder
DOC 2018-0203536-00
Acct 1149-Premium Title CA
Thursday, DEC 20, 2018 10:24:08
SB2 $75.00|MOD $2.00|REC $12.00
FTC $1.00|DAF $2.70|REF $0.30
RED $1.00|ERD $1.00|
Ttl Pd $95.00 Nbr-0003371007
MLB/RC/1-2

Recording Requested By:
.OCWEN LOAN SERVICING, LLC

When Recorded Return To:

OCWEN LOAN SERVICING, LLC
1795 INTERNATIONAL WAY
IDAHO FALLS, ID 83402

2018-03D59-CA

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Contra Costa, California
SELLER'S SERVICING #: ▮▮▮▮ "RUNNALS"
SELLER'S LENDER ID#: DW 24110
OLD SERVICING #: ▮▮▮▮

MIN #: ▮▮▮▮ SIS #: 1-888-679-6377

Prepared By: Jimilla Hicks, OCWEN LOAN SERVICING, LLC 1795 INTERNATIONAL WAY, IDAHO FALLS, ID 83402
800-746-2936

For Value Received, Mortgage Electronic Registration Systems, Inc. as nominee for INDYMAC BANK, F.S.B. A
FEDERALLY CHARTERED SAVINGS BANK, its successors and assigns hereby grants, assigns and transfers to
U.S. BANK NATIONAL ASSOCIATION, AS TRUSTEE FOR LEHMAN MORTGAGE TRUST MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES 2007-2 at C/O OCWEN LOAN SERVICING, LLC., 1661
WORTHINGTON ROAD, STE 100, WEST PALM BEACH, FL FL all its interest under that certain Deed of Trust
dated 12/22/2006 , in the amount of $780,000.00, executed by DONALD J RUNNALS AND URSULA R RUNNALS
MARRIED AS JOINT TENANTS to MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE
FOR INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK, ITS SUCCESSORS AND ASSIGNS
and Recorded: 01/09/2007 as Instrument No.: 2007-0006836-00 in the County of Contra Costa, State of California.

In witness whereof this instrument is executed.

Mortgage Electronic Registration Systems, Inc. as nominee for INDYMAC BANK, F.S.B. A FEDERALLY
CHARTERED SAVINGS BANK, its successors and assigns

On December 14, 2018

By: _____
Jimilla B. Hicks
Assistant Secretary

'SWP'SWPGMAC'12/14/2018 08:28:49 AM' GMAC40GMACA0000000000000005462935' CACONTR'▮▮▮CASTATE_TRUST_ASSIGN_ASSN '*JBHGMAC'

STATE OF FLORIDA
COUNTY OF PALM BEACH

On **December 14,2018**, before me, _____ **Kayla Murphy** _____, a Notary Public in and for Palm Beach in the State of Florida, personally appeared **Jimilla B. Hicks**, Assistant Secretary, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/ their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
**Kayla Murphy**

Notary Expires: **JUN 2 1 2019**

KAYLA MURPHY
Notary Public - State of Florida
Commission # FF 242558
My Comm. Expires June 21, 2019

(This area for notarial seal)

'SWP'SWPGMAC'12/14/2018 08:26:49 AM' GMAC40GMACA00000000000005462935' CACONTR' ▮▮▮▮ CASTATE_TRUST_ASSIGN_ASSN **JBHGMAC'

# EXHIBIT "D"



## Procedures Manual

Release 19.0
June 14, 2010

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 46 of
68

# Transfer of Beneficial Rights to Member Investors

## Overview

Although MERS tracks changes in ownership of the beneficial rights for loans registered on the MERS® System, MERS cannot transfer the beneficial rights to the debt. The debt can only be transferred by properly endorsing the promissory note to the transferee. As a MERS Member you have two options for registering a transfer of beneficial rights to another Member: Option 1 and Option 2. The determination of whether Option 1 or Option 2 is used is based on the Membership Profile of the purchasing investor.

### Option 1

An Option 1 transfer can be created in either flat file/EDI X12 mode or online.

In an Option 1 transfer, the Investor transfers beneficial rights on a system other than MERS (example: MORNET) and that system then initiates the MERS transaction.

Loans in an Option 1 batch that have not been registered are automatically reprocessed ("cycled") until the loans have been registered, up to ten (10) calendar days from the Transfer Date. Option 1 investors receive notification when MIN cycling begins through the *Transfer of Beneficial Rights Reject Report*.

If you include MINs that are not registered in your agency transmission (e.g. MORNET), you will receive an abbreviated version of the *Transfer of Beneficial Rights Reject Report* listing these unregistered MINs. It is your responsibility to register these MINs immediately, entering your MERS Org ID in the Investor field. If you register them after the 10 day cycling process is over, you must name the Agency in the Investor field.

An Option 1 Transfer of Beneficial Rights will replace any Option 2 investor on the loan. The investor that was removed during the Option 1 process is notified of its removal by the *Investor Removed by Option 1 TOB report*. Additionally, Interim Funder and Warehouse Gestation Lender interests are released automatically in an Option 1 beneficial rights transfer. No confirmations are required for Option 1 transfers.

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 47 of 68


1.  MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request. The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents.

2.  The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. **MERS agrees not to assert any rights** (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law.

3.  MERS shall at all times comply with the instructions of the holder of mortgage loan promissory notes. In the absence of contrary instructions from the note holder, MERS shall comply with instructions from the Servicer shown on the MERS® System in accordance with the Rules and Procedures of MERS.

4.  No rights or obligations of the Member with respect to any data or information supplied to MERS by or on behalf of the Member shall be altered or affected in any manner by the provision of such data or information to MERS (except as otherwise specifically provided in these Terms and Conditions or the Rules of Membership).

5.  If the Member uses MERS as Original Mortgagee (MOM) on the security instrument, the loan must be registered on the MERS® System within 10 days of the Note Date.

6.  **MERS and the Member agree that: (i) the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans,** (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, and (iii) membership in MERS or use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System.

7.  If the Member has a third-party register loans (the "Registrar") on the MERS® System on behalf of the Member, the Registrar shall not be deemed an agent of MERS. The Registrar shall be solely an agent for the Member, and MERS is only giving consent to the Member to use a Registrar to enter information on the MERS® System on behalf of the Member. The Member agrees that MERS is not liable to the Member for any errors and omissions, negligence, breach of confidentiality, breach of the Rules and Procedures, or willful misconduct of the Registrar, or any employee, director, officer, agent or affiliate of the Registrar in performing its services to the Member.

8.  The Member shall promptly pay to MERS the compensation due it for transactions registered on the MERS® System and other services rendered to the Member based on the then current MERS fee schedules, which may change from time to time. The Member shall promptly pay to MERS any interest and penalties on delinquent fee payments at the rate set by MERS from time to time. MERS shall have the authority to impose reasonable penalties and fines on Members for breach of the Governing Documents, and the Member shall promptly pay such fines in accordance with the terms of their imposition.

9.  MERS shall indemnify and hold harmless the Member, and any employee, director, officer, agent or affiliate of the Member ("Member Party"), from and against any and all third-party claims, losses, penalties, fines, forfeitures, reasonable attorney fees and related costs, judgments, and any other costs, fees and expenses ("indemnified Payments") that the Member Party may sustain directly from the negligence, errors and omissions, breach of confidentiality, breach of the Terms and Conditions, breach of the Rules and Procedures, or willful misconduct of MERS, or any employee, director, officer, agent or affiliate of MERS ("MERS Indemnified Claim"). Notwithstanding the foregoing, MERS shall not be liable or responsible under the terms of this Paragraph for any losses or claims

resulting from the actions or omissions of any person other than an employee, director, officer (who is also an employee of MERS), agent or affiliate of MERS.

The Member shall indemnify and hold harmless MERS, and any employee, director, officer, agent or affiliate of MERS ("MERS Party"), for any Indemnified Payments which do not result from a MERS Indemnified Claim and which such MERS Party incurs (i) from the negligence, errors and omissions, breach of confidentiality, breach of the Terms and Conditions, Rules and Procedures, or willful misconduct of a Member Party, (ii) with respect to a transaction on the MERS® System initiated by such Member, or (iii) as a result of compliance by MERS with instructions given by the Member, or its designee, as beneficial owner, servicer or secured party shown on the MERS® System ("Member Indemnified Claim").

MERS shall promptly notify the Member if a claim is made by a third party against either MERS or the Member with respect to any mortgage loan registered on the MERS® System in which the Member is shown on the MERS® System as beneficial owner, servicer or secured party in accordance with the Rules and Procedures. The Member shall promptly notify MERS if a claim is made against the Member that may be subject to the indemnification provisions of this Paragraph.

The obligations of MERS and the Member under this Paragraph shall survive the termination of the Member's use of the MERS® System.

10. MERS and the Member shall maintain appropriate insurance coverage that shall include an errors and omissions insurance policy and a fidelity bond. MERS shall not be required to maintain coverage for persons who may be appointed at the request of the Member as certifying officers of MERS. The Member's policies shall protect and insure MERS against losses in connection with the release or satisfaction of a mortgage loan without having obtained payment in full of the indebtedness secured thereby. Upon request, MERS or the Member shall cause to be delivered to the other a certified true copy of such errors and omissions insurance policy and fidelity bond.

In the event of any loss of principal or interest on a mortgage loan or any Indemnified Payments for which reimbursement is received from a fidelity bond or any errors and omissions insurance policy or other insurance policy, the proceeds from any such bond or insurance shall be held in trust for and be promptly paid to the Member who is shown as the servicer on the MERS® System on behalf of the beneficial owner unless otherwise requested by the beneficial owner.

11. Any notice or other communication which is required or permitted to be given or made to MERS pursuant to any provision of the Governing Documents shall be given or made in writing and shall be sent by nationally recognized overnight courier, or facsimile followed by delivery of the original via first class mail, addressed as follows: MERS, Corporate Secretary, 1818 Library Street, Suite 300, Reston, Virginia, 20190.

12. These Terms and Conditions and all transactions effected by the Member with MERS shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without regard to its choice of law provisions.

13. Neither the Member nor MERS shall institute a proceeding before any tribunal to resolve any controversy or claim arising out of or relating to these Terms and Conditions, Rules and Procedures, or the breach, termination or invalidity thereof (a "Dispute"), before such party has sought to resolve the Dispute through direct negotiation with the other party. If the Dispute is not resolved within thirty (30) days after a written demand for direct negotiation, the parties shall attempt to resolve the Dispute through mediation. If the parties do not promptly agree on a mediator, either party may request the then chief judge of the Circuit Court of Fairfax County, Virginia to appoint a mediator. All mediation proceedings hereunder shall be held in Washington, D.C. If the mediator is unable to facilitate a settlement of the Dispute within a reasonable period of time, as determined by the mediator, the mediator shall issue a written statement to the parties to that effect and the aggrieved party may then seek relief in accordance with the arbitration provisions of this Paragraph. The fees and expenses of the mediator shall be paid by the party initiating the Dispute.

In the event that the Member and MERS are not able to resolve a Dispute in accordance with the mediation provisions of this Paragraph, such Dispute shall be settled by binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof; provided, however, that the place of arbitration shall be Washington, DC, and fees and expenses for the arbitration proceedings shall be paid by the party initiating arbitration.

# EXHIBIT "E"

424B5 1 v067219_424b5.htm
PROSPECTUS SUPPLEMENT
(To Prospectus dated February 20, 2007)

**$312,448,100 (Approximate)**
# LEHMAN MORTGAGE TRUST
**Mortgage Pass-Through Certificates, Series 2007-2**

## AURORA LOAN SERVICES

**Lehman Brothers Holdings Inc.**
Sponsor and Seller
**Lehman Mortgage Trust 2007-2**
Issuing Entity

**Aurora Loan Services LLC**
Master Servicer
**Structured Asset Securities Corporation**
Depositor

---

**Consider carefully the risk factors beginning on page S-13 of this prospectus supplement and on page 6 of the prospectus.**

For a list of capitalized terms used in this prospectus supplement and the prospectus, see the glossary of defined terms beginning on page S-87 in this prospectus supplement and the index of principal terms on page 187 in the prospectus.

The certificates will represent interests in the issuing entity only and will not represent interests in or obligations of the sponsor, the depositor or any of their affiliates or any other party.

This prospectus supplement may be used to offer and sell the certificates only if accompanied by the prospectus.

The trust will provide for the issuance of:

- Sixteen classes of senior certificates, including four classes of interest-only certificates and four classes of exchangeable securities.

- Ten classes of subordinate certificates, including two classes of interest-only certificates.

- Three additional classes of certificates.

The certificates represent ownership interests in a trust fund that consists primarily of three separate pools of mortgage loans.

The classes of certificates offered by this prospectus and supplement are listed, together with their initial class principal amounts (or class notional amounts) and interest rates, under "The Offered Certificates" on page S-1 of this prospectus supplement. This prospectus supplement and the accompanying prospectus relate only to the offering of the certificates listed in the table on page S-1 and not to the other classes of certificates that will be issued by the trust fund as described in this prospectus supplement.

Principal and interest on the offered certificates will be paid monthly. The first expected distribution date will be March 26, 2007. Credit enhancement for the offered certificates includes subordination, loss allocation and, for certain of the offered certificates, cross-collateralization features.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved the certificates or determined that this prospectus supplement or the accompanying prospectus is accurate or complete. Any representation to the contrary is a criminal offense.**

The certificates offered by this prospectus supplement will be purchased by Lehman Brothers Inc., as the underwriter, from Structured Asset Securities Corporation, and are being offered by Lehman Brothers Inc. from time to time for sale to the public in

Case: 24-40053   Doc# 27   Filed: 03/20/24   Entered: 03/20/24 12:58:27   Page 51 of 68

negotiated transactions or otherwise at varying prices to be determined at the time of sale. The underwriter has the right to reject any order. Proceeds to Structured Asset Securities Corporation from the sale of these certificates will be approximately 100.156% of their initial total principal amount, plus accrued interest, before deducting expenses.

On or about February 28, 2007, delivery of the certificates offered by this prospectus supplement, except the Class R Certificate, will be made through the book-entry facilities of The Depository Trust Company, Clearstream Banking Luxembourg and the Euroclear System, and delivery of the Class R Certificate will be made in physical form at the offices of Lehman Brothers Inc., New York, New York.

*Underwriter*:

## LEHMAN BROTHERS

The date of this prospectus supplement is February26, 2007

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 52 of 68

**Important notice about information presented in this
prospectus supplement and the accompanying prospectus:**

We provide information to you about the certificates offered by this prospectus supplement in two separate documents that progressively provide more detail: (1) the accompanying prospectus, which provides general information, some of which may not apply to your certificates and (2) this prospectus supplement, which describes the specific terms of your certificates.

The information presented in this prospectus supplement is intended to enhance the general terms of the accompanying prospectus. If the specific terms of this prospectus supplement and the general terms of the accompanying prospectus vary, you should rely on the information in this prospectus supplement.

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with different information.

We are not offering the certificates in any state where the offer is not permitted. We do not claim that the information in this prospectus supplement and prospectus is accurate as of any date other than the dates stated on their respective covers.

--------------------------------

Dealers will deliver a prospectus supplement and prospectus when acting as underwriters of the certificates and with respect to their unsold allotments or subscriptions. In addition, all dealers selling the certificates will be required to deliver a prospectus supplement and prospectus for ninety days following the date of this prospectus supplement.

--------------------------------

We include cross-references in this prospectus supplement and the accompanying prospectus to captions in these materials where you can find further related discussions. The following table of contents and the table of contents in the prospectus provide the pages on which these captions are located.

**For European Investors Only**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), the underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of certificates to the public in that Relevant Member State prior to the publication of a prospectus in relation to the certificates which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of certificates to the public in that Relevant Member State at any time: (a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities; (b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or (c) in any other circumstances which do not require the publication by the issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of certificates to the public" in relation to any certificates in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the certificates to be offered so as to enable an investor to decide to purchase or subscribe the certificates, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

S-ii

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 54 of
68

# Tables of Contents

**Prospectus Supplement**

| | **Page** |
|---|---|
| The Offered Certificates | S-1 |
| Summary of Terms | S-3 |
| Risk Factors | S-13 |
| Glossary | S-23 |
| Description of the Certificates | S-23 |
| General | S-23 |
| Book-Entry Registration | S-23 |
| Priority of Distributions | S-24 |
| Exchangeable Certificates | S-26 |
| Distributions of Interest | S-27 |
| Distribution of Prepayment Premium Amounts | S-28 |
| Distributions of Principal | S-30 |
| Cross-Collateralization | S-31 |
| The Residual Certificates | S-32 |
| Allocation of Realized Losses | S-32 |
| Optional Purchase of the Mortgage Loans | S-34 |
| Fees and Expenses of the Trust Fund | S-34 |
| Description of the Mortgage Loans | S-35 |
| The Mortgage Loans | S-35 |
| Subgrouping/Collateral Groups | S-36 |
| Collateral Group 1 | S-36 |
| Collateral Group 2A | S-37 |
| Collateral Group 2B | S-37 |
| Collateral Group 2C | S-37 |
| Static Pool Information | S-38 |
| Affiliations and Relationships | S-38 |
| Origination of the Mortgage Loans and Underwriting Guidelines | S-39 |
| Lehman Bank Underwriting Guidelines | S-41 |
| IndyMac Bank Underwriting Guidelines | S-44 |
| General Underwriting Guidelines | S-47 |
| Additional Information | S-49 |
| The Sponsor | S-49 |
| The Depositor | S-49 |
| The Master Servicer | S-50 |
| The Servicers | S-50 |
| General | S-50 |
| Aurora Loan Services LLC | S-50 |
| IndyMac Bank, F.S.B. | S-50 |
| Administration of the Trust Fund | S-51 |
| Servicing and Administrative Responsibilities | S-51 |
| Trust Accounts | S-53 |
| Example of Distributions | S-54 |

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 55 of 68

| | |
|---|---|
| Mortgage Loan Servicing | S-55 |
| General | S-55 |
| Servicing Accounts and the Collection Account | S-56 |
| Servicing Compensation and Payment of Expenses | S-56 |
| Waiver or Modification of Mortgage Loan Terms | S-57 |
| Prepayment Interest Shortfalls | S-57 |
| Advances | S-57 |
| Primary Mortgage Insurance | S-58 |
| Collection of Taxes, Assessments and Similar Items | S-58 |
| Insurance Coverage | S-58 |
| Evidence as to Compliance | S-58 |
| Master Servicer Default; Servicer Default | S-59 |
| Amendment of the Servicing Agreements | S-59 |
| Custody of the Mortgage Files | S-59 |
| Special Servicer for Distressed Mortgage Loans | S-59 |
| Pledge of Servicing Rights | S-60 |
| Actions by the Sponsor and its Affiliates | S-60 |
| Trust Agreement | S-60 |
| General | S-60 |
| The Issuing Entity | S-60 |
| The Trustee | S-61 |
| Assignment of Mortgage Assets | S-63 |
| Representations and Warranties | S-64 |
| Certain Matters Under the Trust Agreement | S-65 |
| Reports to Certificateholders | S-69 |
| Voting Rights | S-70 |
| Yield, Prepayment and Weighted Average Life | S-71 |
| General | S-71 |
| Subordination of the Offered Subordinate Certificates | S-78 |
| Weighted Average Life | S-79 |
| Material Federal Income Tax Considerations | S-80 |
| General | S-80 |

S-iii

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 56 of 68

| | **Page** |
|---|---|
| Additional Considerations for the Class 2-A6, Class 2-A9 and Class 2-A12 Certificates | S-80 |
| Residual Certificate | S-82 |
| Additional Considerations for the Exchangeable Certificates | S-83 |
| Legal Investment Considerations | S-83 |
| ERISA Considerations | S-83 |
| Use of Proceeds | S-84 |
| Underwriting | S-85 |
| Legal Matters | S-85 |
| Ratings | S-85 |
| Glossary of Defined Terms | S-87 |
| Annex A: Certain Characteristics of the Mortgage Loans | S-A-1 |
| Annex B: Principal Amount Decrement Tables | S-B-1 |
| Annex C: Available Exchange Combinations | S-C-1 |

S-iv

Case: 24-40053   Doc# 27   Filed: 03/20/24   Entered: 03/20/24 12:58:27   Page 57 of 68

# The Offered Certificates

The certificates consist of the classes of certificates listed in the tables below, together with the Class B5, Class B6, Class B7, Class P1, Class P2 and Class LT-R Certificates. Only the classes of certificates listed in the tables below are offered by this prospectus supplement.

| Class | Collateral Group | Class Principal or Notional Amount[1] | Initial Interest Rate[2] | Summary Interest Rate Formula | Summary Interest Rate Formula Subject to: Minimum Rate | Maximum Rate | Principal Type | Initial Certificate Ratings[3] S&P | Moody's | Fitch |
|---|---|---|---|---|---|---|---|---|---|---|
| 1-A1 | 1 | $ 20,086,000 | 5.7500% | 5.7500% | Not Applicable | Not Applicable | Senior, Non-accelerating[4] | AAA | Aaa | AAA |
| 1-A2 | 1 | $ 113,818,000 | 5.7500% | 5.7500% | Not Applicable | Not Applicable | Senior, Sequential | AAA | Aaa | AAA |
| 2-A1 | 2A, 2B, 2C | $ 157,378,000 | 5.6300% | LIBOR + 0.3100% | Not Applicable | Not Applicable | Senior, Pass-Through, Exchangeable | AAA | Aaa | AAA |
| 2-A2 | 2A, 2B, 2C | $ 144,064,000 | 5.6300% | LIBOR + 0.3100% | 0.3100% | 7.0000% | Super Senior, Pass-Through, Exchangeable | AAA | Aaa | AAA |
| 2-A3 | 2A, 2B, 2C | $ 13,314,000 | 5.6300% | LIBOR + 0.3100% | 0.3100% | 7.0000% | Senior Support, Pass-Through, Exchangeable | AAA | Aa1 | AAA |
| 2-A4[6] | 2A | $ 45,533,000 | 5.6300% | LIBOR + 0.3100% | 0.3100% | 7.0000% | Super Senior, Pass-Through | AAA | Aaa | AAA |
| 2-A5[6] | 2A | $ 4,208,000 | 5.6300% | LIBOR + 0.3100% | 0.3100% | 7.0000% | Senior Support, Pass-Through | AAA | Aa1 | AAA |
| 2-A6[6][5] | 2A | $ 49,741,000[7] | 1.3700% | 6.6900% - LIBOR | 0.0000% | 6.6900% | Senior, Interest-Only | AAA | Aaa | AAA |
| 2-A7[6] | 2B | $ 20,707,000 | 5.6300% | LIBOR + 0.3100% | 0.3100% | 7.0000% | Super Senior, Pass-Through | AAA | Aaa | AAA |
| 2-A8[6] | 2B | $ 1,914,000 | 5.6300% | LIBOR + 0.3100% | 0.3100% | 7.0000% | Senior Support, Pass-Through | AAA | Aa1 | AAA |
| 2-A9[6][5] | 2B | $ 22,621,000[7] | 1.3700% | 6.6900% - LIBOR | 0.0000% | 6.6900% | Senior, Interest-Only | AAA | Aaa | AAA |
| 2-A10[6] | 2C | $ 77,824,000 | 5.6300% | LIBOR + 0.3100% | 0.3100% | 7.0000% | Super Senior, Pass-Through | AAA | Aaa | AAA |
| 2-A11[6] | 2C | $ 7,192,000 | 5.6300% | LIBOR + 0.3100% | 0.3100% | 7.0000% | Senior Support, Pass-Through | AAA | Aa1 | AAA |
| 2-A12 | 2C | $ 85,016,000[7] | 1.3700% | 6.6900% - LIBOR | 0.0000% | 6.6900% | Senior, Interest-Only | AAA | Aaa | AAA |
| 2-A13 | 2A, 2B | $ 72,362,000[7] | 1.3700% | 6.6900% - LIBOR | 0.0000% | 6.6900% | Senior Support, Interest-Only, Exchangeable | AAA | Aaa | AAA |
| M | All | $ 8,845,000 | 6.0000% | Weighted Average Rate-0.4254% [8] | Not Applicable | Not Applicable | Subordinate | AA+ | Aa2 | AA+ |
| B1 | All | $ 6,161,000 | 6.0000% | Weighted Average Rate-0.4254% [8] | Not Applicable | Not Applicable | Subordinate | AA- | N/R | AA |
| BIO1 | All | $ 15,006,000[7] | 0.4254% | 0.4254% | Not Applicable | Not Applicable | Subordinate, Interest-Only | AA- | N/R | AA |
| B2 | All | $ 3,159,000 | 6.2500% | Weighted Average Rate-0.1754% [8] | Not Applicable | Not Applicable | Subordinate | N/R | N/R | A |
| BIO2 | All | $ 3,159,000[7] | 0.1754% | 0.1754% | Not Applicable | Not Applicable | Subordinate, Interest-Only | N/R | N/R | A |
| B3 | All | $ 2,370,000 | 6.4254% | Weighted Average Rate [8] | Not Applicable | Not Applicable | Subordinate | N/R | N/R | BBB |
| B4 | All | $ 631,000 | 6.4254% | Weighted Average Rate [8] | Not Applicable | Not Applicable | Subordinate | N/R | N/R | BBB- |
| R | 1 | $ 100 | 5.7500% | 5.7500% | Not Applicable | Not Applicable | Senior, Residual | AAA | Aaa | AAA |

(1)   These balances are approximate, as described in this prospectus supplement.

(2)   Reflects the initial interest rate as of the first distribution date.

(3)   The designation "N/R" means that the specified rating agency will not rate the certificates of that class.

(4)   The Class 1-A1 Certificates will not receive principal payments at the same rate as the other senior certificates because principal payments generally will not be distributable to the Class 1-A1 Certificates until beginning with the distribution date in March 2012.

(5)   The Class 2-A6 and Class 2-A9 Certificates will each be issued in two components: a Class I Component and a Class P Component, as described in this prospectus supplement. Each Class I Component will be issued with an interest-bearing component and will accrue interest at the rate described in the table above. Class P Components will not be issued with an interest rate or principal balance. The components are not severable.

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 58 of 68

(6)    These classes of certificates are Exchange Certificates. Certain combinations of Exchange Certificates can be exchanged for corresponding Exchangeable Certificates, as described in this prospectus supplement.

(7)    Initial notional amount. The Class 2-A6, Class 2-A9, Class 2-A12, Class 2-A13, Class BIO1 and Class BIO2 Certificates are interest-only certificates; they will not be entitled to payments of principal and will accrue interest on their notional amounts as described in this prospectus supplement.

(8)    The weighted average rate applicable to this formula will be based on the weighted average of the designated rate applicable to Collateral Groups 1, 2A, 2B and 2C, weighted on the basis of the group subordinate amounts thereof.

S-1

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 59 of 68

The offered certificates will also have the following characteristics:

| Class | Record Date[1] | Delay / Accrual Period[2] | Interest Accrual Convention | Final Scheduled Distribution Date[3] | Expected Final Distribution Date[4] | Minimum Denominations | | Incremental Denominations | CUSIP Number |
|---|---|---|---|---|---|---|---|---|---|
| 1-A1 | CM | 24 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AA 0 |
| 1-A2 | CM | 24 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AB 8 |
| 2-A1 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AC 6 |
| 2-A2 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AD 4 |
| 2-A3 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AE 2 |
| 2-A4 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AF 9 |
| 2-A5 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AG 7 |
| 2-A6 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 1,000,000 | $ 1 | 52521D AH 5 |
| 2-A7 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AJ 1 |
| 2-A8 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AK 8 |
| 2-A9 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 1,000,000 | $ 1 | 52521D AL 6 |
| 2-A10 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AM 4 |
| 2-A11 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AN 2 |
| 2-A12 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 1,000,000 | $ 1 | 52521D AP 7 |
| 2-A13 | DD | 0 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 1,000,000 | $ 1 | 52521D AQ 5 |
| M | CM | 24 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AR 3 |
| B1 | CM | 24 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AS 1 |
| BIO1 | CM | 24 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 1,000,000 | $ 1 | 52521D AT 9 |
| B2 | CM | 24 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AU 6 |
| BIO2 | CM | 24 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 1,000,000 | $ 1 | 52521D AV 4 |
| B3 | CM | 24 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AW 2 |
| B4 | CM | 24 Day | 30/360 | 3/25/2037 | 2/25/2037 | $ | 100,000 | $ 1 | 52521D AX 0 |
| R | CM | 24 Day | 30/360 | 3/25/2037 | 3/25/2007 | | 100%[5] | Not Applicable | 52521D AY 8 |

(1)  CM = For any distribution date, the close of business on the last business day of the calendar month preceding the month of the related distribution date. DD = For any distribution date, the close of business on the business day immediately before that distribution date.

(2)  24 Day = For any distribution date, the interest accrual period will be the calendar month preceding that distribution date. 0 Day = For any distribution date, the interest accrual period beginning on the immediately preceding distribution date (or February 25, 2007, in the case of the first accrual period) and ending on the calendar day immediately before the related distribution date.

(3)  Calculated as described in this prospectus supplement.

(4)  The expected final distribution date, based upon (i) the applicable prepayment assumption and (ii) the modeling assumptions used in this prospectus supplement, each as described under "Yield, Prepayment and Weighted Average Life—Weighted Average Life." The actual final distribution date for each class of offered certificates may be earlier or later, and could be substantially later, than the applicable expected final distribution date listed above.

(5)  The Class R Certificate will be issued in definitive, fully registered form, representing the entire percentage interest of that class.

S-2

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 60 of 68

# Summary of Terms

· This summary highlights selected information from this document and does not contain all of the information that you need to consider in making your investment decision. To understand all of the terms of the offering of the certificates, it is necessary that you read carefully this entire document and the accompanying prospectus.

· While this summary contains an overview of certain calculations, cash flow priorities and other information to aid your understanding, you should read carefully the full description of these calculations, cash flow priorities and other information in this prospectus supplement and the accompanying prospectus before making any investment decision.

· Some of the information that follows consists of forward-looking statements relating to future economic performance or projections and other financial items. Forward-looking statements are subject to a variety of risks and uncertainties, such as general economic and business conditions and regulatory initiatives and compliance, many of which are beyond the control of the parties participating in this transaction. Accordingly, what actually happens may be very different from the projections included herein.

· Whenever we refer to a percentage of some or all of the mortgage loans in the trust fund or in a pool, that percentage has been calculated on the basis of the total scheduled principal balance of those mortgage loans as of February 1, 2007 in the trust fund or in a pool, as the context requires, unless we specify otherwise. We explain in this prospectus supplement under "Glossary of Defined Terms" how the scheduled principal balance of a mortgage loan is determined. Whenever we refer in this summary of terms or in the risk factors section of this prospectus supplement to the total principal balance of any mortgage loans, we mean the total of their scheduled principal balances, unless we specify otherwise.

## Parties

### Sponsor and Seller

Lehman Brothers Holdings Inc. will sell the mortgage loans to the depositor.

### Depositor

Structured Asset Securities Corporation, a Delaware special purpose corporation, will sell the mortgage assets to the issuing entity. The depositor's address is 745 7th Avenue, New York, New York, and its telephone number is (212) 526-7000.

### Issuing Entity

Lehman Mortgage Trust 2007-2, a common law trust formed under the laws of the State of New York.

### Trustee

U.S. Bank National Association will act as trustee for the trust.

### Master Servicer

Case: 24-40053   Doc# 27   Filed: 03/20/24   Entered: 03/20/24 12:58:27   Page 61 of 68

Aurora Loan Services LLC, an affiliate of Lehman Brothers Holdings Inc., the depositor and Lehman Brothers Inc., will oversee the servicing of mortgage loans by the primary servicer, but will not be ultimately responsible for the servicing of the mortgage loans except as described in this prospectus supplement.

S-3

*Primary Servicers*

On the closing date, Aurora Loan Services LLC and IndyMac Bank, F.S.B. will service approximately 55.54% and 42.15%, respectively, of the mortgage loans in the trust fund.

Subsequent to the closing date, primary servicing may be transferred to primary servicers other than the initial applicable servicer in accordance with the provisions of the trust agreement and the related servicing agreement, as described in this prospectus supplement.

*See "The Servicers" and "Mortgage Loan Servicing" in this prospectus supplement for information regarding the servicers and servicing of the mortgage loans.*

*Originators*

Approximately 54.98% and 42.15% of the mortgage loans in the trust fund were originated by Lehman Brothers Bank, FSB and IndyMac Bank, F.S.B., respectively. The remaining 2.87% of mortgage loans were originated by various other originators.

*See "Underwriting Guidelines" in this prospectus supplement for informaiton regarding the originators.*

*The Mortgage Loans*

The certificates represent ownership interests in a trust fund, the assets of which will consist primarily of three pools of mortgage loans: "pool 1," "pool 2" and "pool 3." The pools were sorted, generally, on the basis of whether the related mortgage loans are subject to the payment of prepayment premium amounts in connection with any voluntary prepayments in full, and certain voluntary prepayments in part, made during varying periods after origination. Pool 1 will consist of mortgage loans that are subject to prepayment premium amounts in connection with any voluntary prepayments in full, and certain voluntary prepayments in part, regardless of whether such prepayments are made concurrently with the sale of the related mortgaged property. Pool 2 will consist of mortgage loans that are subject to prepayment premium amounts in connection with any voluntary prepayments in full, and certain voluntary prepayments in part, except when such prepayments are made concurrently with the sale of the related mortgaged property. Pool 3 will consist of mortgage loans that are not subject to any prepayment premium amounts. The mortgage loans will have a total principal balance as of the cut-off date, which is February 1, 2007, of approximately $315,923,631.

The mortgage loans will be secured by mortgages, deeds of trust, or other security instruments, all of which are referred to in this prospectus supplement as mortgages. The mortgage loans in the trust fund will generally consist of fixed rate, conventional, fully amortizing and balloon, first lien residential mortgage loans.

S-4

## Aggregate Mortgage Loan Summary

| | Range or Total | Weighted Average | Total Percentage |
|---|---|---|---|
| Number of Mortgage Loans | 769 | — | — |
| Total Scheduled Principal Balance | $ 315,923,631 | — | — |
| Scheduled Principal Balances | 25,171 to<br>$ $1,497,472 | $ 410,823 | — |
| Mortgage Rates | 6.000% to<br>9.000% | 6.710% | — |
| Original Terms to Maturity (in months) | 360 | — | — |
| Remaining Terms to Maturity (in months) | 348 to 360 | 358 | — |
| Original Loan-to-Value Ratios | 21.05% to<br>100.00% | 74.23% | — |
| Number of Interest Only Mortgage Loans | 218 | — | 35.05% |
| Number of Balloon Mortgage Loans | 186 | — | 16.23% |
| Geographic Distribution in Excess of 10.00% of the Total Scheduled Principal Balance: | | | |
| California | 247 | — | 38.38% |
| New York | 69 | — | 10.45% |
| Maximum Single Zip Code Concentration | 2 | — | 0.69% |
| Credit Scores | 606 to 810 | 710 | — |
| Number of Mortgage Loans with Prepayment Premium Amounts at Origination | 330 | — | 44.94% |

The mortgage loans are not insured or guaranteed by any government agency.

*See "Description of the Mortgage Pool" in this prospectus supplement and "The Trust Funds—The Mortgage Loans" in the prospectus for a general description of the mortgage loans.*

None of the mortgage loans in the trust fund will be "high-cost loans" under applicable federal, state or local anti-predatory or anti-abusive lending laws.

### *Collateral Groups*

In order to facilitate the structuring of the certificates, each mortgage loan, or a specified portion thereof, has been assigned to one or more "collateral groups" based on the mortgage loan's net mortgage rate. Each collateral group, in turn, has been designed to support the payment of a separate group of certificates (identified in the table on page S-1). For example, Collateral Group 1 has been assembled by allocating specified portions of certain loans (based on allocation percentages described in this prospectus supplement) such that the collateral group will produce interest at an annual rate of 5.75%; amounts received on the collateral group will be applied on each distribution date to pay the related senior certificates which bear interest at a blended rate of 5.75% per annum. Because amounts from a collateral group will be distributed to the related certificate group, the payment experience of any collateral group will determine the rate of payments on the certificates.

"Collateral Group 1" consists of mortgage loans in pool 1, pool 2 and pool 3 or portions thereof that have been stripped to a net mortgage rate of 5.75%. "Collateral Group 2A" consists of mortgage loans in pool 1 or portions thereof that have been stripped to a net mortgage rate of 7.00%. "Collateral Group 2B" consists of mortgage loans in pool 2 or portions thereof that have been stripped to a net mortgage rate of 7.00%. "Collateral Group 2C" consists of mortgage loans in pool 3 or portions thereof that have been stripped to a net mortgage rate of 7.00%.

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 64 of 68

The collateral groups are expected to have the following characteristics:

S-5

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 65 of
68

| TO: | Sean Curtis Ferry,SBN 310347; sferry@raslg.com of ROBERTSON, ANSCHUTZ, SCHNEID& CRANE LLP, 350 10th Avenue, Suite 1000 San Diego CA 92101 Telephone: (470) 321-7112 Attorneys for alleged Creditor U.S. Bank National Association, as Trustee for Lehman Mortgage Trust Mortgage Pass-Through Certificates, Series 2007-2 (hereinafter "USBNA") |
|---|---|
| FROM: | Ursula Rosemarie Runnals<br>c/o 9 Middle Road, Lafayette, California state |
| SUBJECT: | NOTICE |
| DATE: | 15 March 2024 |

Certified Mail #9589071052700483435747
Account #015360115
Loan Number #124959067

## NOTICE

NOTICE is served upon **Sean Curtis Ferry SBN 310347; sferry@raslg.com** of ROBERTSON, ANSCHUTZ, **SCHNEID& CRANE LLP,** alleged counsel for and in behalf of **USBNA** pertaining to the matter of **Case No. 24-40053** for Debtor, Ursula Rosemarie Runnals, Chapter 13 Petition:

1. This notice is served via email to **Sean C. Ferry SBN 310347; sferry@raslg.com** and US mail as set out above, with respect to the above numbered action of said Debtor originally filed in the United States Bankruptcy Court in the Northern District of California, Oakland Division (hereinafter "USBC NDOC").under **Case No.: 24-40053.**

2. Upon review of your **OBJECTION TO CONFIRMATION OF DEBTOR'S CHAPTER 13 PLAN OF REORGANIZATION** (hereinafter "OTCODC13POR") with your Form 410 Proof of Claim (**POC**), etc., documents that on March 6, 2024, you did "*electronically filed the foregoing with the Clerk of Court*" in said case number, wherein the contents of the same you seem to indicate that you represent the alleged "**secured creditor**", **USBNA. Sir,** How so? How is that possible when there is no evidence available to the general public that the alleged secured creditor is a secured creditor at all when it comes to the subject property of Debtor, Ursula Rosemarie Runnals as a matter of law? Please be advised that I, Donald Runnals, in good faith hired the service of one **Joseph R. Esquivel Jr.** to conduct a Mortgage Compliance Investigations Chain of Title Analysis & Mortgage Fraud Investigation requested regarding the Loan Instruments and the associated real property located at 9 Middle Road, Lafayette, California state, as referenced in the Contra Costa County Record. I understand that Mr. Esquivel, a licensed private investigator, and is a court recognized fact witness expert regarding issues of securitization of loan documents and mortgage fraud investigations.

3. I provided Mr. Esquivel copies of all the original loan documents, and he went to work. Mr. Esquivel provided me with his notarized Affidavit of facts pertaining to said loan documents. It came as quite a shock to us what is contained in his research. Your client is **NOT** the secured creditor having foreclosing rights to our home. The affidavit reveals that there is no document evidencing any relationship with your client or your client's assigns/successor. Thus, there is no evidence establishing a chain of title to your client at all. So, how is your client empowered to foreclose on my home?

4. Dear Mr. Ferry it does appear that your client's evidence or statement/s of standing to foreclose contains false, fraudulent and fictitious allegations and therefore you appear to have made a misrepresentation to the court in violation of your sworn duty as an officer of the court respecting due diligence in preparation of the pleading filed over your signature, et seq, this **NOTICE** intends to, first, point out to you the apparent misrepresentations and then secondly, afford to you an opportunity to make an informed choice to correct and or withdraw those misrepresentations prior to the necessity of one having to bring this matter to the attention of the court pursuant to Title 18 U.S.C. § 4 with appropriate sanctions being requested. I further am prepared to forward a true copy of this notice to the State Bar of California pursuant to B &P C § 6068 (a), (b), (c), (d), (f), (g), §6106, §6128 (a) for purpose of disbarment proceedings against you and your confederates.

5. There appears to be a fraud on the court by your characterization of your client being a "**secured creditor**" as is declared in your **OTCODC13POR and POC** you **electronically** filed of record and further sent through the United States Mail service, supporting your declaration which fail to establish as fact the actual existence of a "**secured creditor**" who hired your firm.

6. Mr. Ferry, have you actually reviewed all the original loan documents regarding this instant matter? I find it hard to believe that you did, being one who is legally trained. You just might want to review a second time prior to one again having to bring this matter to the attention of the court. I do this in good faith with respect given the sentiments of Roscoe Pound and Professor Wigmore's lament "whatever happened to the sporting theory of justice." Clearly it appears that you may have been misled to lie under oath before the court by way of your client. Mr. Ferry, CCP § 128.7 and/ or FRCP Rule 11(c) and Rule 56(h) is cited in light of Title 42 U.S.C. § 1986 for having knowledge of the law and you are now without excuse dear sir, especially in light of Title 18 U.S.C. § 4 supra.

7. Mr. Ferry, if you would take the proper time to review the original loan documents pertaining to the subject property of interest and the attached copy of the Affidavit of Mr. Esquivel, you might want to consider withdrawing your pleadings as they currently stand.

8. Mr. Ferry, by the way, just where is and who has actual physical custody of the original INTEREST ONLY FIXED RATE NOTE ("**IOFRN**") and deed of trust that are the foundational documents that serves as the basic thrust for all your client's purported claims, assertions for being the duly empowered "secured creditor?"

9. I am further demanding from you certified true and correct color copy of **said IOFRN**, the **deed of trust**; insurance policy on the **IOFRN**; all bookkeeping ledger accounts; all escrow title confidential communications; 1099 OID Form; Deposit Application/Custody Receipt (DTC) form; Deposit Application One to Four Family Mortgages - Form MTG1-MORTDP.WK4; Federal Reserve Borrower in Custody of Collateral- six page form for said **IOFRN**; certified copies of the cancelled check/s associated with loan **Account #015360115** that should have been issued by **IndyMac Bank, F.S.B.** in payment of said **IOFRN** either the week before or after December 22nd, A.D. 2006;

10. Again, in light of the work done by Mr. Esquivel, either you or your client is openly lying before the court (perjury) and cannot meet the standard of "harmless error" as it were, and this **NOTICE** intends to bring this matter to your attention prior to the necessity of having to notice the court and other authorities. It is my hope by our mutual agreement that a contest rising from this misrepresentation will become unnecessary. Again, the warning is done for your benefit.

11. If the foregoing is true then all of your sworn statement presented to the court in your presentments, both state and federal are subject to the penalty of false affidavits of CCP §128.7, FRCP Rule 11(c), Rule 56(h) as one who is legally trained is required to know beforehand. You are without excuse. Further the duty of an attorney is outlined in Business & Profession Code 6068, to wit:

    (a) To **support the Constitution and laws of the United States and of this state**.
    (b) To maintain the **respect due to the courts of justice and judicial officers**.
    (c) To **counsel or maintain those actions, proceedings, or defenses only as appear to him or her legal or just**, except the defense of a person charged with a public offense.
    (d) To employ, for the purpose of maintaining the causes confided to him or her **those means only as are consistent with truth, and never to seek to mislead the judge or any judicial officer** by an artifice or false statement of fact or law.          Emphasis added **bold** mine

12. I believe I can make the case that you and your company have violated all of the above duties as attorneys at law. The problem is that your **pleadings** filed over your signature as attorney of record make allegations which are unsubstantiated and apparently false, fraudulent and fictitious and thus constitute a material misrepresentation before the court that you knew or should have known were false as your duty under the mandate of CCP §128.7, FRCP Rule 11(c), Rule 56(h). Clearly then Penal Code § 115.5, § 115(a), and §134 are apparent felony violations committed by your client and/or assignor/seller unless you can provide the dispositive evidence of the specific documents demanded in paragraph 9 above under Affidavit that proves otherwise to rebut the Affidavit of Mr. **Joseph R. Esquivel Jr.**

13. I maintain that the sole intent of your actions were done for purpose of fraud, deceit, theft of real property rights, unlawful conversion of real property, domestic terrorism, simulation of judicial process for purpose of unjust enrichment, extortion in conjunction with wire fraud, mail fraud in an artifice to deprive Debtor of the intangible right to honest services mandated under Title 18 U.S.C. § 1341, § 1343 and § 1346 among other high crimes and misdemeanors. Clearly, the facts involving the history of this matter, if they had been properly vetted with due diligence by unbiased jurist as required by the rules, would have merely corroborated the facial absence of any legitimate justiciable claim by your purported client as a matter of law.

Case: 24-40053    Doc# 27    Filed: 03/20/24    Entered: 03/20/24 12:58:27    Page 67 of 68

14. Mr. Ferry you should be aware, both Debtor and I have and further are undergoing angst, trauma and great mental duress as result of this matter. Our family reputation has been and continues to be injured by the tactics of unjust enrichment of your client and your actions. Your pleadings having been filed and their continuation is actionable elder abuse for starters and in due course will result in our having to seek remedies afforded by law. In light of the foregoing fact that neither the court nor Debtor were ever provided actual evidence of debt under oath to establish the lawful standing of your client is a willful violation of CCP §128.7, B&P Code §6068(d), §6128(a). Simply stated, absent actual proof of claim sworn under affidavit oath is not right and Debtor will seek a complete correction of this wrong. **Remember, Fraud and Justice Never Dwell Together! Further the law leaves wrongdoers where it finds them!**

15. Accordingly, I suggest that you carefully consider the foregoing and that you exercise this opportunity to make an informed choice as to whether to withdraw or otherwise abate the false, fraudulent and fictitious allegations as are contained in the underlying **pleadings,** further immediately prior to Debtor having to present these findings before the court.

16. As you are aware, you have an affirmative duty under CCP §128.7, FRCP Rule 11 (c), Rule 56(h) to ascertain the truthfulness of your client's standing as stated in your pleadings via a diligent inquiry into the facts, the evidence, and the law applicable in this case that are ***reasonable under the circumstances***." It appears that you have failed to meet that criterion of the foundational threshold mandated under FRCP Rule 11 (c) supra. Through you as counsel, your client has proceeded on an unlawful extortion by way of unjust enrichment through fraud in factum, deceit, failure of full disclosure of contract terms of the subject property without a just and proper interest in this case. You either knew or you should have known these circumstances from an affirmative inquiry prior to placing these misrepresented facts and pleadings before the court. As stated, I hope that this matter can be explained as you having been misled by your client and that these are not your affirmative acts of overt misrepresentation. Unfortunately, under these circumstances, they remain as your affirmative errors and omissions. Unfortunately, these circumstances bring into question your own standing as counsel in this case, before the State Bar of California and as an officer of the court. I fear that you have been misled by the prevarications and mendacity of your client and/or your own lack of due diligence as required by the rules of court.

17. Prudence dictates that you reconsider your position in this matter prior to any further actions on our home. I here extend this opportunity for you to do so by withdrawing the offending pleadings in general and compensate Debtor by immediate reconveyance of subject property and return of all monies collected from Debtor by your client to abate the ongoing injuries to our family and to the dignity of the court.

18. Unless this conflict is immediately resolved, it is my duty to bring this matter to the public attention of both the court and bar pursuant to the procedures set out in California law and to further seek and employ all other remedies at law.

19. Mr. Ferry, I now put it to you as one now having knowledge of the law, facts and evidence pertaining to this instant matter so that you are now without excuse and cannot come to the bar and plead ignorance of either the law, facts or evidence. I can only hope that you will do your due diligence and vet the foregoing and that after such vetting you agree with what is stated herein that you will do what is right in the eyes of the law prior to actual controversy.

May I hear from you on this matter before the end of 25 March 2024, business day.

It hath been said and so it is done!

Sincerely

Ursula Rosemarie Runnals

Encl: copy of Affidavit of Joseph R. Esquivel, Jr.

cctbs: State Bar of California
        Attorney General of California, Fraud Division